**ELYRIA IRON & STEEL CO. et al. v. AMERICAN WELDING & MFG. CO.**

(District Court, N. D. Ohio, E. D. August 17, 1923.)

No. 736.

**I. Patents ⬤═╼328.**

Lloyd patent, 1,028,039, May 28, 1912, claims 4, 5, and 8, for process for manufacturing metal tubes, *held* invalid.

**2. Patents ⬤═╼328.**

Lloyd, No. 1,124,760, January 12, 1915, claims 7 and 12, for continuous welding mechanism, *held* invalid.

**3. Patents ⬤═╼325.**

Defendant's unnecessary incumbering of record with irrelevant testimony and prior art *held* not to warrant denial of costs to it, in view of a number of patents and claims originally in issue and late hour at which part of them were abandoned by plaintiff.

In Equity. Patent infringement suit by the Elyria Iron & Steel Company against the American Welding & Manufacturing Company. Bill dismissed.

Decree affirmed 15 F.(2d) 111.

Wm. McKnight, of New York City, and Bert M. Kent, of Cleveland, Ohio, for plaintiff.

Pennie, Davis, Marvin & Edmonds, of New York City, and Brockett, Hyde & Milburn, of Cleveland, Ohio, for defendant.

WESTENHAVER, District Judge. [1, 2] The original bill charged infringement of certain claims of certain patents issued to M. B. Lloyd, namely, claims 1 to 9 of 1,028,039, 1 and 2 of 1,124,756, of 1 to 15 of 1,124,760, of 15, 16, and 45 of 1,124,763, of 1 to 11 of 1,124,766, and of the single claim of 1,141,068, and also charged infringement of claim 1 of United States reissue patent 13,941 to Altman. Title to all these patents is conceded to be in plaintiffs. At the beginning of this hearing, plaintiffs dismissed as to patents 1,124,756, 1,124,763, 1,124,766, and 13,941. They also withdrew all the claims of 1,028,039, except claims 4, 5, and 8, and of 1,124,760 except claims 7 and 12. Defendant set up as defenses all the usual grounds of invalidity and noninfringement. In their briefs counsel concede the evidence shows that the single claim of 1,141,068 for a lineally extended welding flame is invalid. Hence the issues to be decided are reduced to claims 4, 5, and 8 of Lloyd patent, 1,028,039, issued May 28, 1912, on application filed July 12, 1911, for a process of manufacturing metal tubes, and to claims 7 and 12 of Lloyd patent, 1,124,760, issued January 12, 1915, on application filed July 12, 1911, for a continuous welding mechanism. Both patents are in the metal butt welding art, particularly as practiced with an acetylene torch or flame. The questions of law and fact are quite similar to those involved in Thompson Spot Welder Co. v. Ford Motor Co. (D. C.) 268 F. 837, on appeal (6 C. C. A.) 281 F. 680.

Defendant's alleged infringing structure will be described first, because the controversy here involves a part only of the steps of the Lloyd process patent and a part only of the mechanism of the Lloyd apparatus patent, such as pertain merely to the welding means and process. Defendant's structure is known as the Ætna machine, and will be so referred to herein. It is made under patent 1,282,163, issued to N. D. Abbey, October 22, 1918.

The essential elements of a tube butt welding machine, plaintiffs' expert admits, are feeding or forwarding means, a tube positioning or seam guiding means, adjustable holding and pressure rolls, and an acetylene torch or heating means. All of these are present in the Ætna machine. It has two feed rolls disposed in a vertical plane upon horizontal axes, the co-operating faces of which are circularly grooved to receive a preformed tube. These serve as forwarding means. The lower roll is stationary, while the upper is adjustable therefrom. The upper roll carries in its center a fin or blade to engage the open seam of the tube, and serves to keep open, straighten the seam, and guide the tube in a fixed position with the seam at the top. It has a smaller guide roll with a blade face between the forwarding and pressure rolls likewise to engage the seam and aid further in performing the same functions. It has two pressure or welding rolls disposed in a horizontal plane on vertical axes. These rolls are adjustable toward and away from each other, have circular grooves to engage and accommodate the tube, and are spaced apart so as to expose the seam to the welding flame. It has an acetylene gas torch of standard construction placed above the pressure rolls. The torch is adjustable and is so disposed that the seam edges may be heated to the desired fusing or welding heat slightly in advance of the transverse axis of the pressure rolls. In practice, the torch may be adjusted so that the flame is applied at such a point as in the operator's judgment will produce the best result. In the Ætna machine and in actual practice this flame is applied slightly in advance of the transverse axis of the pressure rolls. The distance is estimated by witnesses as from three-sixteenths to one-half of an inch, but it is agreed that the point of greatest heat intensity is approximately at the point where the pressure of the pressure rolls brings the seam edges into contact. The Ætna machine also has an additional set of pressure rolls to the rear of the welding rolls to engage the advancing end of the welded tube to aid in guiding, forwarding, and completing the operation. It is defendant's contention that these means or their equivalents and this method of butt-welding tubes is found in Parpart, Altman, Maugin, Harmatta, and other patents prior to Lloyd, presently to be reviewed.

Lloyd's process patent embodies a complete process of manufacturing tubes of which butt-welding is only a part. It contemplates taking the metal in the form of continuous thin strips wound upon a reel, drawing it through forming tools which shape it into a tube. It then presses the edges thereof against each other, guides the tube thus formed with the seam on top, to pressure or welding rolls, welds the seams by any suitable heating means, preferably an acetylene flame, cools the tube beyond the pressure rolls, removes thereafter the seam burr with a knife or scraper, measures and cuts the tube into predetermined lengths, and also, if desired, reduces its size by a drawing process. The movement is continuous, progressive, and longitudinal. It is performed by means of a chain grip vise. Lloyd says the steps which characterize the process claimed in his application lie between the letters $B$ and $G$ of figure 1. All the foregoing steps, except the feeding of the flat strips to the forming tools, and the measuring and cutting of the tube into the desired lengths, and the subsequent reduction of size are to be performed between $B$ and $G$, and would seem to be each and all essential parts of his process of manufacturing metal tubes. As specified, the tube edges are held pressed firmly together as and after the tube leaves the forming tools, and the heating flame is applied to the top of the seam and at the point of the transverse axis of the pressure rolls. Alternative means are provided for preheating the seam before entering the pressure rolls. And, as an incidental step, provision is made for cooling the tube after it is welded.

The elements of claim 4 in issue are: (1) Moving longitudinally metal tubing having a longitudinal seam, at a constant rate of speed and progressively; (2) positively positioning the seam at one point and holding the tube against lateral movement in any direction; (3) pressing the seam edges together at that point; (4) applying a welding flame to said edges at that point to weld the same. Claim 5 adds to the fourth element, "confining welding heat to

said edges by chilling the remainder of the tube at said point." Claim 8 is substantially the same as 5.

Lloyd's mechanical patent, 1,124,760, is for an apparatus to practice all of the steps of the process patent. It is described as a continuous welding mechanism. Those elements pertaining to the burr removing, measuring, cutting, and reducing mechanism may be disregarded, since not involved in this controversy. Likewise the elements pertaining to the feeding of the flat strip metal and the forming mechanism may be disregarded, except as the forming mechanism serves as forwarding rolls and positioning and seam guiding means. Claims 7 and 12, it is asserted, embody only the simple elements of forwarding rolls, positioning, and seam guiding means, and the pressure, heating, and welding elements exclusively of the tube forming, burr removing, measuring, cutting, and reducing means, and the chain grip vise for imparting longitudinal movement. Whether this be true or not is open to question, but, for the purposes of this case, plaintiffs' construction of these claims will be accepted.

The elements of claim 7 are: (1) Fixed means for imparting longitudinal movement to a longitudinally seamed metal tube in combination with; (2) rotary devices positioned at one point in the path of the tube serving to hold the tube at that point against lateral movement and formed and adapted to press the seam edges together and expose them at said point; (3) a welding torch for progressively uniting the seam edges where thus held and exposed. Claim 12 is not substantially different. The tube forming mechanism is said to be the mechanical equivalent of the forwarding rolls of the Ætna machine, and also that it performs in part the function of positioning and guiding the tube. The fin of the upper forwarding roll and the intermediate guide roll of the Ætna machine holding and keeping open the seam, are not present or called for. The pressure or welding rolls of the two are substantially the same, including the water cooling and adjusting devices. The gas torch is the preferred welding mechanism, and is also substantially the same as in Ætna, although Lloyd says any one of the various kinds of seam welding or closing mechanisms may be used. Provision is made for preheating the seam with an additional gas flame of less intensity, and for cooling the tube after it is welded. Neither of these features is found in the Ætna.

Boiled down and briefly stated, the controversy pertains to butt welding of tubes. The process is simply an application of heat sufficient to fuse to the melting point the seam edges of a tube, and the application thereto of sufficient pressure to weld it. To perform this process is required only the simple elements of feed or forwarding rolls, means for positioning and guiding the tube, means for pressing or holding the seam edges together while at welding heat, and means for furnishing and applying the heat. If the claims in issue are to be construed as covering these simple elements, they can be sustained only if Lloyd was a pioneer in the art.

On this hearing and in the briefs, the character of the weld is much stressed. Several of the pertinent prior art patents are distinguished only on this ground. A distinction, both as to the process and the apparatus, is attempted, based merely upon the character of the weld. It is said that some of the prior art machines produced an electric resistance weld, and others a blacksmith weld, but that Lloyd's process and apparatus produces a melt weld, and that this is a different process. This alleged difference is, in my opinion, immaterial. Any difference in the kinds of weld is not found or claimed in plaintiffs' patent, nor can any be found in the prior art. In plaintiffs' patent sufficient pressure is contemplated to produce the burr, said to characterize an electric resistance or blacksmith weld. These different types of weld are inventions in terminology and not in processes or in mechanics. They are descriptive merely of the molecular action taking place in making a weld, due to the differences in the degree of heat or pressure then applied. Any process or apparatus which produces one can readily be made to produce the other. All that is required is the application of a greater degree of heat and of pressure at the welding point. Most, if not all, of the prior machines for electrical butt, lap, or spot welding and for acetylene gas welding disclose means for adjusting the degree of heat and of pressure, and, if such means were not disclosed, the provision thereof would be within the expected skill of one trained in the art.

In my opinion, the electric welding process and apparatus for practicing it are a part of the prior pertinent art. See Thompson Spot Welder Co. v. Ford Motor Co. (6 C. C. A.) 281 F. 680, 684. Electric welding, it seems, was developed earlier than oxy-

acetylene gas welding. The source and nature of the heat is different, and different means for applying it are required; but the process, as well as the means for practicing it, is in all its essential features the same as oxyacetylene gas welding. It had been applied extensively to butt, lap, and spot welding long before Lloyd entered the field as an inventor. Oxyacetylene gas welding seems to have been first developed in France, and was extensively practiced there before coming into use in this country. See American Machinist, June 3, 1909, p. 940, Bernier monograph entitled, "Autogenous Welding of Metals," translated and published in the United States in 1908; also numerous French patents, particularly Altman, Javal, Maugin, and Harmatta. It was, or believed to be, more expensive than electric welding, and this belief, taken with the previous equipment of plants with electric weld apparatus, probably explains the delay in its adoption and development in this country. The undeniable fact, however, is that the process of oxyacetylene gas welding and apparatus for practicing it was well known, in general use, and highly developed before Lloyd began his experiments. He is in no sense a pioneer in the art.

The record in this case is voluminous. An extraordinary number of prior art patents, sixty-three in all, both for electric and gas welding, have been cited and produced. In the trial they were discussed by defendant's expert with tiresome prolixity. Counsel, however, have in their briefs with commendable brevity limited their discussion to a few only of these patents, and, since counsel on both sides are in agreement as to which are most pertinent and controlling, I shall likewise limit my review of the prior art.

In the electric welding art is found United States letters patent 658,741, issued to Otto Parpart, September 25, 1910. The apparatus therein disclosed has been since continuously used by one of the plaintiffs or its predecessor in title, and by others. This apparatus discloses all the elements and means of the Ætna machine, except that it has added current conducting rolls which serve primarily to carry the electric heating current. It has an initial guide in advance of the feed rolls, which performs the function of the fin of the upper draft roll in the Ætna machine. It has a second guide between the draft and pressure roll, and a final set of draft rolls beyond the pressure rolls, as in Ætna. If Ætna infringes the Lloyd patents, then Lloyd infringes Parpart, unless the element of current conducting rolls is sufficient to distinguish the structures. If the current conducting rolls were eliminated and a gas torch substituted, the Parpart machine would butt-weld tube in precisely the same manner and perform the welding process in precisely the same way as in Ætna. No reconstruction of the apparatus is necessary beyond changing the heating means. In other respects there are greater differences between Ætna and Lloyd than between Lloyd and Parpart. In view of the previous well-known process of oxyacetylene gas welding and the various forms of apparatus already patented to practice it, no invention would, in my opinion, be required to substitute the gas torch for the electric current conducting rolls. It should be further noted that Parpart applies the heat at the same point slightly forward of the transverse axis of the pressure rolls as in Ætna, and not at a point in the transverse axis, as is contemplated by Lloyd. In United States letters patent 747,841, issued December 22, 1903, to G. Baehr, the application of heat is, however, made at a point in that transverse axis.

Moise Altman, a Frenchman, May 18, 1906, obtained French patent 396,962 for a process and means of butt-welding tubes with an acetylene torch. Plaintiffs' expert concedes that it produces a melt weld. Generally speaking, it discloses the elements of claim 4 of Lloyd's process patent 1,028,039, if that claim is to be given the broad construction contended for. It moves longitudinally metal tubing having a longitudinal seam, and progressively, at a constant rate of speed; it positively positions the seam and holds the tube against lateral movement in any direction; it presses the seam edges together and applies a welding flame to said edges to weld the tube at one point in its travel. This is done, however, not at a point in the transverse axis of the pressure rolls. The means for practicing the process are, however, decidedly different from the Ætna structure and from Lloyd's means for accomplishing these various functions. However, Altman, December 5, 1910, demanded and on March 11, 1911, obtained addition 13,595 to his patent, which counsel apparently concede in their brief is a full anticipation, but assert that Lloyd's invention date is shown to be earlier. It is difficult for me to see why the same concession should not be made as to French patent 395,281 to Maugin, delivered December 23,

1906, and French patent 410,597 to Harmatta, delivered March 17, 1910, both of which are prior to the earliest invention date claimed for Lloyd. In view of this concession, nothing further need be said as to Altman's addition, except that in my opinion, saving the water cooling devices, it is the same as the Ætna machine with respect to the features in issue.

Maugin French patent, 395,281, dated December 23, 1908, discloses forwarding rolls, pressure or welding rolls adjustable toward and from each other, a seam guide interposed between the two sets of rolls, and an oxyacetylene gas torch heating the seam slightly in advance of the transverse axis of the pressure rolls. These elements are the equivalent of the Ætna structure, except only the water cooling arrangement of the pressure rolls, which, however, are found in Harmatta. Plaintiffs' counsel seek to distinguish Maugin only on the ground that it produces a blacksmith weld as distinguished from a melt weld; but, as already said, this distinction is untenable. The burr resulting from the welding pressure, said to characterize a blacksmith as distinguished from a melt weld, appears to be precisely the same as is disclosed in the Lloyd patent, and to remove which his burr removing means are provided. As already said, what happens in welding two pieces of metal together depends upon the degree of heat and pressure, and Maugin, as well as Lloyd, Parpart, and other inventors, has provided means to adjust the pressure and to increase or diminish the heat.

Harmatta's French patent, 410,597, was applied for December 16, 1909, and delivered March 11, 1910. Harmatta's inventive genius and his standing in the welding art are evidenced not only by this patent but by his patents under review in Thompson Spot Welder Co. v. Ford Motor Co., supra. I am wholly unable to perceive any patentable difference between Harmatta and defendant's structure. If, therefore, Ætna infringes Lloyd, Harmatta fully anticipates Lloyd. Harmatta describes various alternative methods of applying the heat, depending on the thickness of the tube to be welded, but, in the preferred and simpler form, it is exactly, not merely substantially, the Ætna structure, including the positioning and guiding fin on the upper forwarding roll, and means for water cooling the pressure rolls.

In addition thereto, the following patents are pertinent, although not embodying so closely the same process of welding, nor the same mechanical means for practicing it; namely, U. S. letters patent to Altman, 961,394; reissue thereof 13,941; Budd, 948,965 (shown to have been extensively used for producing tube); and French patent, 366,159, to Javal.

Lloyd's process patent may be valid for a continuous process; but the claims in issue, particularly when construed as covering the simple and fundamental steps of the process and means of practicing it, cannot be sustained. My conclusion is that the claims of both patents are anticipated by French patent to Altman, 363,962, with addition 13,595, French patent to Maugin, 395,291, and French patent to Harmatta, 410,597. If these patents are not a full anticipation, my opinion further is that, in view of them and of Parpart 683,066, Budd, 948,965, Javal, 366,159, no invention is present in these claims.

Due consideration has been given to plaintiffs' evidence of public acquiescence and commercial success. The licenses evidencing public acquiescence cover numerous other patents. Many business reasons exist why licensees may have been willing to enter into them, depending in no wise on the validity of the several claims and of the two patents now under consideration. If plaintiffs had owned no patents except the two in issue, and if these patents were limited to the inventions covered by the claims in issue, it is hardly probable that plaintiffs would have invested money therein or that other persons would have taken licenses. Be this, however, as it may, the situation in this respect is less impressive than a similar situation in Thompson Spot Welder Co. v. Ford Motor Co., supra. The license situation and public acquiescence with respect to the patents there involved were before me in Thompson Spot Welder Co. v. National Electric Welder Co. (D. C.) 260 F. 223. I am content to say, as did Judge Knappen, that, under the circumstances, the alleged commercial success of Lloyd's invention "is entitled to little weight upon the question of invention, even were that question otherwise in doubt, which we think it is not."

Defendant also insists that the Ætna machine does not infringe. This contention is based primarily upon the fact that the heat is to be applied at a point in the transverse axis of the pressure rolls under both Lloyd patents. This appears to be the letter of the claims in issue and also of the

specifications of both patents. The file history of these patents is not in evidence, and it does not appear whether such a limitation was imposed or accepted by Lloyd in order to get his claims allowed over Parpart and other prior inventors. If Lloyd had made a substantial advance in the art worthy to be considered a meritorious invention, I should not be disposed so to limit his claims in the absence of an agreed limitation, and, if a patent had been allowed on this narrow ground, I should hesitate to sustain it as a patentable advance in the art. This is particularly true when Lloyd provides means for preheating and for adjusting the torch. If, however, the claims in issue of Lloyd's apparatus patent could be sustained in view of the prior art, they would have to be limited to the specific structure disclosed in his drawings and specifications. The differences between Ætna and Lloyd's means for positioning, forwarding, and guiding the tube and keeping open its seam, as well as cooling the tube are so far different from the Ætna structure that infringement could not be found.

No finding need be made as to priority between Lloyd and Altman's addition, 13,-595. The result would be the same in either event. The evidence on this point was taken and submitted in deposition form, without the examination of witnesses orally; hence, if it becomes necessary, a reviewing court is in equally as good a situation to weigh the evidence and make the finding as is a trial court.

[3] For the reasons herein stated, plaintiffs' bill will be dismissed. I have considered whether defendant should be denied costs because of the unnecessary incumbering of the record with irrelevant testimony and prior art. In view of the number of patents and claims originally in issue and the late hour at which plaintiffs abandoned the same, I have concluded to allow defendant full costs, but this abuse in patent cases is so common and flagrant as to call for a drastic correction.